**NORTHERN PETROCHEMICAL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 71–1701.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1972.

Decided Nov. 21, 1972.

Jonathan G. Axelrod, Atty., N.L.R.B., Washington, D. C., for petitioner.

J. J. Kubat, Jr., Omaha, Neb., for respondent.

Before VAN OOSTERHOUT, Senior Circuit Judge, MEHAFFY, Circuit Judge, and DENNEY, District Judge.*

MEHAFFY, Circuit Judge.

Northern Petrochemical Company, petitioner, hereafter "Company," has petitioned for review of an order of the National Labor Relations Board holding that the Company had violated § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3). The case arose from a charge filed by one Douglas K. Morgan for failure to hire him. The Board's decision and order are reported at 194 NLRB No. 54. The Board has cross-appealed for enforcement of the order. There is no dispute about jurisdiction and in fact this court has jurisdiction as the Company transacts business and is authorized so to do in Minnesota, a state within this judicial circuit.

In December of 1970 the Company had under construction an ethylene and polyethylene plant, sometimes called its Morris or Joliet plant. This plant was not completed at the time of the trial. The Company had placed advertisements to attract chemical operators with experience in ethylene and polyethylene operations who could be utilized as process technicians when these operations com-

* Sitting by designation.

menced at its Joliet plant. Clinton, Iowa was selected as one of the places for the advertisement as there is an ethylene and polyethylene plant there where there are employees with experience similar to what was needed for the Company's Joliet plant. The Company started its search in advance as there are very few ethylene-polyethylene complexes in the United States and not many people available with that type experience.

When Morgan, the applicant, first contacted the Company no one had yet been employed as a process technician or operator in its ethylene and polyethylene plants. Morgan was employed at the Hawkeye Chemical plant, a fertilizer plant which is not the type facility contemplated by the Company. When Morgan answered the advertisement for "chemical operator," he asked about jobs for maintenance men. Although the Company was not then seeking maintenance technicians, the Company's industrial relations representative indicated that the Company was interested and sent Morgan an application. On the application Morgan indicated his job preference was for a job as a mechanic and his second choice was for a job as an operator. He was not considered for an operator job but was considered as a maintenance technician. The Company did not advertise for maintenance technicians until January and February of 1971, when advertisements were placed in locations where there were low density polyethylene plants. No one was hired or even interviewed by the maintenance supervisor for maintenance jobs as a result of these advertisements because no one was found with a background of maintenance in low density polyethylene.

Actually, at a later date when Morgan was interviewed the Company planned to hire only about eleven maintenance men with experience in low density polyethylene facilities. Most of the maintenance employees would be supplied by a maintenance contractor who secured employees from local hiring halls. The eleven employees would be the Compa-

ny's own highly skilled maintenance technicians and, of course, would have to have the proper background to do the type of work required in a low density polyethylene plant. There is a vast difference between the experience and abilities necessary to perform in the type of plant the Company had under construction and the work done in the Hawkeye plant where applicant was employed. One of the primary requirements was that the employee had to have the ability to weld, to work with heavy piping and to work on large compressors. By his own admission, applicant was simply not qualified for any position in the new plant contemplated by the Company. He admitted that he had a bad eye, could not weld and had never worked in the type plant the Company was constructing. The largest pipe he had ever worked on was two inches in diameter whereas the piping in the new plant would be nine inches; hence there was no way that he could meet the Company's standards. The pressures in a nine inch diameter pipe in a low density polyethylene plant are 32,000 p. s. i. as compared to 5,000 p. s. i. in two inch pipe. Morgan had "no idea at all" what the Company's facilities would be and had never worked in a low density polyethylene plant. Thus, it is quite obvious that the Company's standards were well above applicant's admitted abilities, but nonetheless in his application Morgan required a $900.00 per month wage when no maintenance man in the Company's plants was hired for such an amount, $909.00 being the maximum with training, experience, etc. that could be worked up to.

So it is that by applicant's own admission he was not qualified for employment. He did have a conversation later with Van Lauwe, the Company's industrial relations representative, wherein his union activities were discussed. This part of the evidence was controverted but it seems clear to us that unqualified though he was, Morgan would lay his failure to obtain employment to his union activities with his present plant. He further testified that some

other company had denied him a job because of his union activities.

■ The sole issue presented is whether there is substantial evidence in the record as a whole to support the Board's finding that the failure to employ Morgan was motivated by reason of his union activities. It is settled law that an employer has the right to hire at will so long as such action is not based on opposition to legitimate union activities. NLRB v. Century Broadcasting Corp., 419 F.2d 771, 778 (8th Cir. 1969). Where, as here, "management can point to sound business reasons for its failure to hire an individual, the Board must prove that these reasons were not the motivating basis for rejection of an application for employment or they were, even if sufficient, pretextual." Reliance Ins. Companies v. NLRB, 415 F.2d 1, 7 (8th Cir. 1969). It is equally well settled that an inference that a failure to hire an employee was due to his union activities must be based upon evidence and not on mere suspicion, and the burden of proving an improper motive in such cases is upon the Board. Singer Co., Wood Products Div. v. NLRB, 371 F.2d 623 (8th Cir. 1967); Reliance Ins. Companies v. NLRB, *supra*. We are cognizant of the rule, relied on by the Board, that a reviewing court may not displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. However, "[t]he Board's power to draw inferences is not beyond all judicial control, and upon the courts is cast the responsibility of determining whether a Board finding of fact, based on inference or otherwise, is supported by substantial evidence, when viewed on the record as a whole." NLRB v. Century Broadcasting Corp., *supra*, 419 F.2d at 779. The evidence on the record as a whole does not rise to the dignity of two conflicting views since there is no substantial evidence to justify the Board's finding that Morgan was not hired because of his union activities. The Trial Examiner's findings, relied upon by the Board, are based upon speculation and conjecture and hence are not supported by evidence. *See* Reliance Ins. Companies v. NLRB, *supra*, 415 F.2d at 7, 8. The Trial Examiner found that Van Lauwe was biased against unions or their members. Accordingly, he accepted Morgan's version of the events and concluded that Morgan was not hired because of his union membership and activities. There is nothing in the record to indicate whether Van Lauwe was friendly or unfriendly towards the labor movement and, hence, nothing to support the Trial Examiner's findings.

The Board adopted the Trial Examiner's conclusions and credited Morgan's version of the events. In so doing, the Board neglects to consider the uncontradicted evidence in the record and seeks to support its findings by speculative inferences. In addition to the fact that Morgan was not qualified, the evidence shows that during the months of January and February, the time Morgan sought employment, the Joliet plant was not complete and that there would be no actual jobs until July and October. During January and February, the Company interviewed several people but no one was found qualified enough to send to the maintenance manager or supervisor, the official who actually made the decision whether or not to hire. Morgan was one of those interviewed but not found qualified enough to send to the maintenance manager. That the Company did not use union activities or the lack of it as a criterion for employment is evidenced by the fact that about half of its non-supervisory employees hired for various jobs at the Joliet plant were members of unions prior to being employed by the Company. We note that the Company has about 1200 employees throughout the United States, that at about six locations the employees were represented by unions, and that there had never been an unfair labor practice charge filed against the Company.

■ The Board attempted to show that Morgan was qualified for a position

with Northern Petrochemical Company through the testimony of his supervisor, Ambrose Dannels, who testified that Morgan was qualified to work at Chemplex, a chemical plant with high pressure equipment. Dannels had never worked at a low density polyethylene plant and did not know what the facilities were going to be at the Joliet plant. We fail to see how this evidence supports the finding that Morgan was qualified. It is argued that the finding of Van Lauwe's union animus is supported by the testimony of Clif James who testified that in his job interview Van Lauwe asked him what he thought about unions. The fact that James was asked this question, when considered in the light of the fact that one-half of the employees hired for the Joliet plant were members of unions, does not support a finding of union animus. *See* Reliance Ins. Companies v. NLRB, *supra*. We hold that the Board's findings are based on suspicion and speculation and that it has not met its burden of proof.

Accordingly, the petition for enforcement is denied and the Board's order is set aside.